IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DEREK M. WILLIAMS,

    Plaintiff,

 v.            OPINION & ORDER

DR. SCHMIDT, DR. BREEN,      14-cv-487-jdp
DR. HAMILTON, and DR. OLBINSKI,

    Defendants.

---

  Plaintiff Derek Williams, an inmate at the Green Bay Correctional Institution, brings claims that psychological staff at the prison failed to properly treat his mental illness and that defendant Todd Hamilton placed him in unconstitutionally harsh conditions of confinement during two stints in "observation" status. Defendants have filed a motion for summary judgment on all of Williams's claims. After considering the parties' summary judgment materials, I will dismiss only a subset of Williams's medical care claims: his claims against defendant Hamilton and his claims against defendant Steven Schmidt for the second half of the time period at issue here. Because the parties have not fully briefed issues regarding Williams's conditions of confinement and qualified immunity, I will defer a ruling on his conditions-of-confinement claims and the remainder of his medical care claims, pending supplemental briefing by the parties.

UNDISPUTED FACTS

Except where noted, the following facts are undisputed.

**A. Parties**

Plaintiff Derek Williams is an inmate in the custody of the Wisconsin Department of Corrections (DOC), who has been incarcerated at the Green Bay Correctional Institution (GBCI) since 2006. Defendants Steven Schmidt, Martha Breen, Todd Hamilton, and Katie Olbinski were employed as psychologists at GBCI. Schmidt was the psychology supervisor.

**B. Observation cells**

Williams's medical care claims concern his mental health treatment from 2010 to 2014. Williams spent most of the first two years in the segregation unit.[1] He spent parts of the first two years in general population and then almost all of the last three years in general population. Williams's conditions-of-confinement claims concern two periods he spent in observation status in 2011: January 31 to February 10, and March 21 to May 16.

When prison officials decide that they need to take immediate steps to prevent an inmate from harming himself, they may place the inmate in observation status in cells in the segregation unit area. Observation status is a "very restrictive status" under which psychological staff ensures that an inmate does not have any property with which he could harm himself or others. Psychological staff also controls the privileges afforded a prisoner in observation status. Staff visually checks on the inmate at least every 15 minutes.

---

[1] Defendants say that the unit is now called the "Restrictive Status Housing Unit," but I take them to be saying that at the time of the events in question, it was still called the segregation unit, so I will use that name.

The segregation unit consists of four wings and a central control station (the bubble) that looks down each wing. Each wing consists of a hallway with cells on either side facing each other. There are cells at the "front" of the wings, closest to the bubble, used for inmates on observation status. Unlike the segregation cells, the cells used for observation do not have a mattress, pillow, or interior light switch used to switch from the normal cell lights to the dimmer "safety light."

## C. Psychological procedures

Psychological Services Unit (PSU) staff conduct routine rounds in the segregation unit, in which they go to the cell front and talk to the inmates. Rounds are generally conducted every week, but psychological staff may see an inmate more frequently if staff or the inmate requests to be seen.

If an inmate requires non-emergency psychological attention, he must submit a Psychological Services Request. Inmates are informed that, if they need to see psychological staff immediately, they need to alert unit staff of their problem or concern. If the request is urgent or emergent in nature, arrangements will be made for a same-day or immediate evaluation as determined by PSU staff.

Psychologists meet with inmates for clinical contacts that focus on diagnosing and treating mental, emotional, and behavioral disorders. Clinical contacts last approximately 30 minutes to 1 hour. Unless the inmate requests to see a clinician for a specific issue, the clinician will ask the inmate what he wants to talk about, and what is currently impacting his mental health. After discussion, the clinician will make a plan to address the issues stated. Psychiatrists, not psychologists, prescribe and manage psychotropic medications.

GBCI psychologists have the discretion to refer any patient to the Wisconsin Resource Center (WRC), which is a mental health facility operated by the Department of Health Services. The fact that a patient is referred to WRC does not mean that WRC will accept the patient. WRC has the discretion to determine which patients it will accept, and GBCI psychological services staff have no power to compel them to accept a particular patient.

There are also several part-time psychiatrists who are responsible for the assessment and diagnosis of GBCI inmates' psychiatric conditions, and the prescription and management of psychotropic medications to inmates.

## D. Williams's background and treatment

Williams has been diagnosed with a host of different mental illnesses during his incarceration, but Williams's expert, Kenneth I. Robbins (a psychiatrist) has diagnosed Williams with Borderline Personality Disorder and Unspecified Anxiety Disorder.[2] Defendants do not dispute this diagnosis. Williams also says that he has "struggled with depression." Defendants respond that he did not have a depression diagnosis, but it is clear from the record that defendants have treated him for "depressive symptoms." Before his DOC incarceration, Williams attempted to kill himself in September 1997 while he was confined at the Milwaukee County Jail.

In 2003, while Williams was incarcerated at the Waupun Correctional Institution, one of his psychologists, Alice Acor, initiated a sexual relationship with him, even though she was ethically obligated not to have sexual contact with her patients. Williams was afraid to say no

---

[2] In his report, Robbins states that Williams had in the past been diagnosed with "Unspecified Depressive Disorder, Depression NOS, Antisocial Personality Disorder, Antisocial Personality Disorder with Narcissistic and Borderline Traits, Unspecified Substance Abuse Disorder, Possible Delusional Disorder, Schizophrenia, and an Adjustment Disorder." Dkt. 69-1, at 11.

to Acor's advances. Williams was worried that if the relationship were discovered he would be accused of sexually assaulting Acor because she was a female staff member and he was a male inmate.[3] After several months, the DOC discovered the relationship. Acor was suspended, and she later committed suicide.

After Williams learned of Acor's suicide, he withdrew from others and felt very depressed. He was transferred to the Columbia Correctional Institution (CCI) in March 2004. While at CCI, Williams struggled to process Acor's death. Williams had difficulty sleeping, lost his appetite, had difficulty concentrating, and began to see and hear hallucinations or "flashbacks" of Acor. Williams continues to hear and see Acor and has repeatedly reported this to the psychologists he has seen, including defendants. All of the defendants are aware of the events involving Williams and Acor.

Because of the events involving Acor, Williams no longer trusts female psychologists and is concerned that they would perceive him negatively because of his past with Acor. He believes that Breen and Olbinski are "biased" against him because of those events. Schmidt wrote an email stating, "I have, in fact, heard clinicians here talk about Williams in quite negative terms and basically saying they don't think they can take him at face value. To me, that did reflect some lack of objectivity on their part. I think some of the female clinicians here did view him more negatively because of the events at WCI." Dkt. 67, at 24. While at GBCI, Williams made repeated requests to defendant Schmidt to be assigned to a male psychologist, but Schmidt did not believe it was clinically necessary for Williams to be seen only by male

---

[3] The parties dispute whether Williams was truly "abused" or "mistreated" by Acor, and the extent of trauma these events caused him, but these are issues of fact that cannot be resolved on summary judgment. I will accept Williams's version of events as true for purposes of evaluating defendants' motion for summary judgment.

clinicians or that he should be transferred to another institution to be treated by other, male staff. He was confident that his staff would act professionally.

While incarcerated at GBCI, Williams attempted suicide on four separate occasions:

- January 31, 2011: Williams cut his arm and neck with a razor blade

- February 1, 2011: Williams cut his arm with a razor blade

- February 7, 2011: Williams made numerous cuts on both arms and wrists with a razor blade

- December 31, 2011: Williams attempted to cut his throat with a razor blade

Williams spent nine stints in observation status during the events relevant to this case, all between January 2011 and January 2012, totaling about 90 days. For each of those observation periods, PSU staff interacted with Williams on a daily basis. Williams states that these "cellside" contacts were only about five minutes long, were limited to a discussion of whether he was suicidal, and were not private. He was also seen by the DOC's director of psychological services, Gary Ankarlo, during his longest period on observation status (about two months from March to May 2011).

During the times Williams was in the segregation unit, not counting his observation time, he was seen by psychologists 26 times out of his cell. Sixteen of these contacts were solo, private meetings with female psychologists, defendants Breen and Olbinski. Four were group sessions with Breen. Six were solo, private meetings with defendant Hamilton. PSU staff also conducted weekly rounds. He also had 12 "cellside" meetings with Breen, Olbinski, or Hamilton.

Williams was housed in general population for the rest of the times relevant to this case. During those times, he was seen by psychologists in solo, private meetings 35 times. Thirteen

of those meetings were with Breen or Olbinski. The final private meeting Williams had with a female psychologist was June 5, 2012, with Olbinski. After that, all of Williams's private meetings were with Schmidt. He also had five "cellside" contacts with Breen or Olbinski, all occurring in 2011.

Defendants memorialized their meetings with Williams on "Psychological Services Clinical Contact" forms, which generally included sections for the psychologist to explain reasons for the contact, relevant history, observations of the prisoner, diagnoses, and the treatment plan or follow up. According to Hamilton, his meetings with Williams "generally focused on Williams's current mental status and talking through issues." Olbinski says that her therapy focused on "having him learn coping strategies, distress tolerance skills, and other various therapeutic techniques to help him with his depression." Olbinski says that Williams periodically would "either refuse to participate or change the subject and deviate from the topic" which she believed meant that Williams "[was] not taking the information internally and wanting to work for change." Schmidt says that during his sessions with Williams, they "discussed his current mental state, coping strategies and perceived barriers to treatment progress."

Williams says that any time he met with defendants Olbinski and Breen in their office without any other persons present, he became very anxious and was unable to focus. However, Olbinski and Breen at times noted that he did not appear to be in any distress.

During the times relevant to this case, Williams had about 40 sessions with psychiatrists. The parties do not dispute that the psychiatric medications prescribed to Williams were appropriate and that Williams was often non-compliant with medications.

For at least portions of the period from 2010 to 2012, Williams's chart included a possible diagnosis of malingering, based mostly on Breen's and Olbinski's notes that Williams's demeanor and interactions with staff were not consistent with the symptoms he self-reported, including depression and having hallucinations of Acor, and that there was a possibility that he was exaggerating symptoms to be moved out of GBCI. On July 6, 2012, Schmidt removed this diagnosis.

In 2012, Schmidt requested that a non-DOC psychologist evaluate Williams. Anna Salter was chosen to evaluate Williams. After reviewing his records and interviewing him twice, she issued a report. The summary stated as follows:

> Mr. Williams is a 39-year old inmate currently serving 180 years for Armed Robbery. He has a history of conning and manipulation within the prison system. For example, in addition to the responsibility which the psychologist had for the fraternization, it was clearly not her agenda to bring in porn for Mr. Williams to sell. He actively recruited her in a scheme that involved another woman whom he also had helping him bring in contraband. In addition, it seems also that he is using the psychologist's death as part of a claim that he is mentally ill. There were no indications of psychosis in the interview and Mr. William's description of visual hallucinations are atypical of psychosis. Mr. Williams does score in the range of high psychopathy. Whenever scores are high on psychopathy, it indicates that staff should pay much more attention to what the inmate does than what he says as verbal reports are not always accurate. On the plus side, while Mr. Williams does have some grievance, paranoia, and suspiciousness, it is not pervasive and does not dominate his world view.

Dkt. 74-1, at 182-83.

On June 13, 2013, Schmidt submitted a referral for Williams to WRC for Dialectical Behavior Therapy. WRC did not accept the referral. Williams has never received this type of therapy.

ANALYSIS

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). All reasonable inferences from the facts in the summary judgment record must be drawn in the nonmoving party's favor. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). If the nonmoving party fails to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the moving party is proper. *Celotex*, 477 U.S. at 322.

## A. Conditions of confinement

As stated above, Williams's conditions-of-confinement claims concern two periods he spent in observation status in 2011: January 31 to February 10, and March 21 to May 16. I previously summarized Williams's conditions-of-confinement allegations against defendant Hamilton as follows:

> Plaintiff now states that when he was in observation status from January 31 to February 10, 2011, the cell was extremely cold (he states that it "felt like [it] was between 35° and 45° . . . daily"), he was provided only with a smock and a blanket, and he would shiver violently enough to make it difficult to eat. Dkt. 17, at 2. During his second stint in observation, March 21 to May 16, 2011, plaintiff was again subjected to cold conditions with little clothing. He was also forced to eat with his hands, which became a problem because he lacked the means to properly clean them— he was given 3 only three squares of toilet paper at a time, and no soap with which to wash his hands. In addition, plaintiff states that there was feces, urine, and blood on the walls of his cell. Plaintiff also states that he was denied his eyeglasses, which led to headaches from constant squinting, and that he suffered from

> sleep deprivation because he was awakened every 15 minutes by
> guards.

Dkt. 27, at 2-3. Defendants move for summary judgment on preclusion grounds and on the merits.

### 1. Preclusion

In an August 5, 2016 order, I denied defendants' motion for partial summary judgment on Williams's conditions-of-confinement claims; that motion was based on issue preclusion grounds. Dkt. 56. Defendants asserted that Williams had previously brought very similar claims regarding his time in the segregation unit in *Williams v. Raemisch*, No. 11-cv-411-slc. In that case, Magistrate Judge Stephen Crocker granted summary judgment to defendant prison officials on Williams's claims that he was subjected to extreme cold, constant illumination, noise, and use of chemical agents, and that he was given inadequate time for recreation while he was in the segregation unit at GBCI from March 2010 to June 2011. *See Raemisch*, No. 11-cv-411, slip op., Dkt. 95 (W.D. Wis. Apr. 1, 2013).

In my August 5 order, I concluded that some of defendants' arguments were actually underdeveloped claim preclusion theories that could not be resolved at that point. The closest defendants came to being granted summary judgment on issue preclusion grounds was on the constant-illumination claim, but because some of the compelling evidence they offered about the similarity of the segregation and observation cells was raised only in their reply, I denied the motion without prejudice. I told defendants that they were free to re-raise preclusion in later summary judgment briefing, which they have now done.

Claim preclusion prohibits litigants from litigating claims that were or could have been litigated during an earlier proceeding. *Highway J Citizens Grp. v. U.S. Dep't of Transp.*, 456 F.3d 734, 741 (7th Cir. 2006). Claim preclusion applies when three elements are met: "(1) an

identity of parties; (2) a final judgment on the merits; and (3) an identity of the cause of action (as determined by comparing the suits' operative facts)." *Palka v. City of Chicago*, 662 F.3d 428, 437 (7th Cir. 2011) (internal citations omitted). Williams disputes only the third element. An identity of causes of action exists when both the prior and subsequent claims arise out of the same transaction, defined for claim preclusion purposes as "a single core of operative facts giving rise to a remedy." *Car Carriers, Inc. v. Ford Motor Co.*, 789 F.2d 589, 593 (7th Cir. 1986). "[A] subsequent suit is barred if the claim on which it is based arises from the same incident, events, transaction, circumstances, or other factual nebula as a prior suit that had gone to final judgment." *Okoro v. Bohman*, 164 F.3d 1059, 1062 (7th Cir. 1999).

In their proposed findings of fact, the parties dispute whether the observation cells are part of the segregation unit. If Williams's time in the observation cells were spent in cells with conditions indistinguishable from the segregation cells, then claim preclusion would likely apply because there is no reason Williams could not have brought claims about the observation cells in his previous case. It is undisputed that the observation cells are in the segregation unit *area*, in the cells closest to the bubble. Because of the proximity of the observation cells to the segregation cells at issue in the '411 case, the conditions of the segregation cells discussed in the '411 case would likely have bled over into the conditions of the observation cells in this case. For instance, it seems highly unlikely that the temperature in the observation cells would be appreciably different from the temperatures in adjacent segregation cells.

But Williams has provided proposed findings showing that the "factual nebulae" regarding the conditions in the two sets of cells are different enough for me to conclude that claim preclusion does not apply. Unlike with the segregation cells, mental health staff controls the conditions of the observation cells and property allowed by the inmates in observation

status. I take Williams to be saying that this results in harsher treatment. In particular, I infer that the observation cells receive significantly greater illumination because those cells, unlike the segregation cells, do not have light switches allowing the inmates to switch from the normal cell lights to the dimmer "safety light."

Defendants argue that Williams at one point asked to be moved from segregation into observation to "be up front again," which undermines his position that the observation cells were harsher. This statement can be used to attack Williams's credibility about the harshness of the cells, but it is not enough to overcome other evidence he produces showing that the segregation cells and observation cells are qualitatively different and are administered by different sets of staff. Therefore, I will deny defendants' motion for summary judgment on claim preclusion grounds. The difference in illumination protocols is also enough for me to reject defendants' companion argument that issue preclusion should apply to the illumination claims, because it does not appear that the issue of *observation-cell* illumination was truly litigated in the '411 case.

## 2. Merits

The state goes on to argue that defendant Hamilton should be granted summary judgment on Williams's conditions-of-confinement claim on the merits. But because the parties provide so few proposed findings about the actual conditions faced by Williams and Hamilton's knowledge of them, I cannot rule on this portion of the motion.

Defendant Hamilton states that "at no time did he believe that placing or keeping Williams in observation status posed a substantial risk of serious harm to his health or safety." Dkt. 87, at 65, ¶ 128. It is unclear exactly what he means by this: for instance, is he saying that the cells were not cold or unsanitary? Or is he saying that they might have been but he was not

aware of the problems? Despite the ambiguity of this statement, it is enough to place the burden on Williams to show why there is a genuine dispute of material fact about Hamilton's deliberate indifference.[4]

This is usually where a plaintiff would provide facts explaining exactly how substandard the conditions of his cells were, and how he knows that Hamilton was aware of them, yet chose not to correct them. But Williams does not do this. For instance, he does not provide any proposed findings stating how cold or unsanitary his cell was. Nor does he explain how Hamilton was aware of this and how he responded to the alleged problems.

Given the arguments in Williams's response brief and the statements that Williams has previously given in declarations and in deposition testimony, I do not take him to be abandoning these claims. But it is not the court's duty to sift through Williams's prior statements to ensure that there is a genuine dispute of material fact about each aspect of his conditions-of-confinement claims. "[S]ummary judgment 'is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (quoting *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). Under Rule 56(e)(1), I will give Williams a final chance to set forth his version of the facts regarding the conditions-of-confinement claims, along with supplemental briefing. Defendants will be given an opportunity to respond to the supplemental briefing. *See* Fed. R. Civ. P. 56(e) ("If a party

---

[4] Defendants argue that Robbins "has no reason to believe that Dr. Hamilton kept Williams on observation status for any reasons other than concern for his safety." Dkt. 87, at 64, ¶ 127, but defendants do not establish whether, in making that statement, Robbins considered Williams's conditions-based allegations. Even if they had established Robbins's knowledge of those allegations, Williams does not need an expert opinion to explain whether conditions like bone-chilling temperatures or bodily-fluid-caked cell walls could violate the Constitution.

fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact.").

## B. Medical care

Williams is proceeding on claims that defendant psychologists Steven Schmidt, Martha Breen, Todd Hamilton, and Katie Olbinski violated his Eighth Amendment rights by failing to provide him with adequate mental health treatment.

To state an Eighth Amendment medical care claim, a prisoner must allege facts from which it can be inferred that he had a "serious medical need" and that defendants were "deliberately indifferent" to this need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A "serious medical need" may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584-85 (7th Cir. 2006). A medical need may be serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371-73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). "Deliberate indifference" means that the officials were aware that the prisoner needed medical treatment but disregarded the risk by failing to take reasonable measures. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997).

The parties do not nail down exactly what mental illnesses Williams suffered during the several-year period at issue in this case, but at minimum they seem to agree with Robbins's diagnoses of Borderline Personality Disorder and Unspecified Anxiety Disorder. Defendants also state that they have treated Williams for depressive symptoms, which jibes with Williams's

account of suffering with depression. It is also undisputed that Williams attempted suicide four times during the events at issue here. In any event, defendants fail to develop an argument that Williams's mental health problems were not a serious medical need, so I will assume for purposes of summary judgment that his needs were serious.[5]

As for the deliberate indifference prong, defendants stress the quantity of treatment the provided Williams. They state that "excluding daily contacts with Williams when he was in observation status, Williams was seen well over 100 times by either a psychologist or psychiatrist." Dkt. 72, at 1-2. Williams points out that about 20 of these contacts were short, non-private "cellside" contacts at which the psychologists merely checked whether he was suicidal. These visits were not full-fledged, private sessions, but they did serve a purpose: along with Williams's several placements in observation, the cellside visits show that defendants took Williams's thoughts of self-harm seriously. In his complaint, Williams includes allegations discussing defendants' failure to respond to his direct statements about suicidal thoughts. Williams's opposition brief does not focus on defendants' attempts at preventing those incidents. So I do not take Williams to be pursuing claims about specific incidents in which defendants failed to properly heed his warnings about self-harm.

Rather, Williams more generally contends that defendant psychologists intentionally failed to provide him with adequate mental health care. But Williams does not dispute that he consistently met with psychologists and psychiatrists. So this is not a case where defendants ignored a medical problem. Claims about the *quality* of treatment actually received can be

---

[5] Defendants refer to Williams's status as "MH-1" as one meaning that Williams was not perceived to have a serious mental illness. But they do not develop an argument on this point in their briefing.

difficult for a plaintiff to prove, because prison medical officials do not violate the Eighth Amendment by disagreeing with another medical professional's opinion or even by committing medical malpractice. *See, e.g.*, *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

Nonetheless, "where evidence exists that the defendants knew better than to make the medical decisions that they did, a jury should decide" whether defendants violated the Eighth Amendment. *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016), as amended (Aug. 25, 2016). Some examples of the situations in which a prison medical professional's treatment may violate the Eighth Amendment are when the professional "fails to follow an existing protocol," *id*. at 729, "persists in a course of treatment known to be ineffective," *id*., at 730, or provides treatment that is "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person[s] responsible actually did not base the decision on such a judgment." *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008).

Williams breaks this prong into two parts: (1) the adequacy of the treatment and (2) defendants' deliberate indifference. He then argues that there is a dispute of material fact over the adequacy of his treatment because defendants' treatment notes and Schmidt's decision to assign Williams female psychiatrists were not within the standard of care. I will not consider the adequacy of the treatment as a separate issue because Williams's claims do not truly hinge on whether the treatment fit within the standard of care: as I stated above, medical negligence does not in itself violate the Eighth Amendment. What matters is whether defendants were deliberately indifferent to Williams's mental health problems. Because, as discussed above, the adequacy of care can give some insight into the state of mind of the defendants, I will address all of Williams's perceived flaws in defendants' actions together below.

### 1. Treatment notes

Williams's expert, Dr. Robbins, states that he found no evidence of adequate care because defendants' treatment notes are so substandard that they do not provide a clear treatment plan or goals, or explain how specific goals might be achieved. The "Psychological Services Clinical Contact" forms generally included sections for the psychologist to explain reasons for the contact, relevant history, observations of the prisoner, diagnoses, and the treatment plan or follow up.

At his deposition, Robbins had the following critique of defendants' notes:

> [S]o usually when you talk about the diagnosis and here's the symptoms they're experiencing, here's the goals we have for our treatment, but then when you look at each individual contact, what you expect to see is here's what he's struggling with, here's the intervention that I made today, here's what I did to try to help him with these symptoms, here's how—you know, did it work, did it not work, how did he respond to it and then here's what's happening in terms of our working towards our goal. And while you might not see that in every note, that's what you should see in many notes, and I didn't see it in any notes.

Dkt. 69, at 33-34. Defendants state that exhaustively reiterating what happened in each session was impractical but that "[r]egardless of whether sessions were extensively documented, sessions did include discussions of symptoms and treatments," Dkt. 87, at 51, ¶ 91. Robbins attempts to rebut this by saying that "[t]he general rule in medicine, psychology and psychiatry is if it's not in your note, it didn't happen." Dkt. 88 at 21, ¶ 52.

Williams's focus on the records is misguided. This case is about defendants' *actual* treatment of Williams, not the notes of their treatment. One might imagine scenarios in which shoddy notes resulted in a prisoner being harmed by follow-up treatment, or in which the notes

revealed direct evidence of deliberate indifference.[6] The mere fact of incomplete recordkeeping may or may not violate the standard of care, but it does not automatically violate the Eighth Amendment. Put together, the notes and defendants' testimony about their treatment provide support for defendants' main theory for summary judgment: they were not deliberately indifferent to Williams's problems because they held dozens of treatment sessions with him. To avoid summary judgment, Williams must still explain how his rights were violated by the events that actually occurred. He raises several arguments in an effort to do this, which I address below.

### 2. Dialectical Behavior Therapy

Williams says that deliberate indifference can be inferred from the fact that he never received Dialectical Behavior Therapy, which Robbins says he should have received. Defendant Schmidt agrees with Robbins that Williams should receive this treatment, and it is undisputed that he referred Williams to the Wisconsin Resource Center for the purpose of receiving it, but that WRC denied the referral.

Williams argues that the WRC denial does not settle the matter, because defendants do not produce evidence showing that this therapy was available only at WRC instead of at GBCI or another facility. In his opposition brief, Williams cites a recent case in this court in which the parties discussed an inmate receiving some form of Dialectical Behavior Therapy at the Columbia Correctional Institution. *See Goodvine v. Ankarlo*, 9 F. Supp. 3d 899, 913-914

---

[6] I do not take Williams to be arguing that the recordkeeping was so shoddy that it exposed him to a risk of harm such as medical providers being unable to tell from the records what medical problems he suffered from or what treatments he was receiving. Nor do I take him to be saying that the records reveal any statements by defendants plainly showing that they meant to harm or disregard Williams.

(W.D. Wis. 2014). He says that this "is evidence to suggest that he could receive such therapy from a DOC institution." Dkt. 79, at 14.

I disagree with Williams's characterization of defendants' burden on summary judgment, and his method of attempting to create a dispute of fact on this issue is flawed. Defendants' version of the facts is that Schmidt tried and failed to obtain this therapy for Williams. At that point, it was not Schmidt's additional burden to provide a complete accounting of where the therapy might be available; it was Williams's burden to show that there is a genuine dispute of material fact. Williams makes an attempt at this, but fails. This court usually does not rely on "facts" contained only in a party's brief, nor does it condone using facts discussed in other judicial opinions as evidence, when Williams easily could have conducted discovery aimed at understanding when and where this type of treatment was available at Wisconsin prisons.

But even assuming that the facts as stated in the *Goodvine* case are true, the ultimate question is whether Schmidt acted with deliberate indifference. At most, all Williams has shown is that there is a possibility that the therapy might also have been available elsewhere. He does not show that Schmidt knew this, or that he consciously decided not to seek out these other options. Williams's speculation that he could have gotten the treatment elsewhere does not raise a reasonable inference that Schmidt acted with deliberate indifference toward him.

### 3. Assignment of female psychologists

The rest of the alleged problems with Williams's treatment are interrelated. Williams argues that Schmidt acted with deliberate indifference by assigning him female psychologists Breen and Olbinski despite knowing about Williams's ongoing struggles with processing the events concerning his interactions with psychologist Acor. Of the 61 out-of-cell "talk therapy"

sessions, 33 of them were with female psychologists Breen or Olbinski. The parties agree that for talk therapy to work, the patient and therapist must trust each other. Yet Schmidt had reason to think that trust could not be developed, because Williams had been traumatized by abuse from Acor and her subsequent suicide. Williams says that he struggled in those sessions, did not develop a rapport with Breen or Olbinski, and requested therapy from a male psychologist. I take him to be saying that his sessions with Breen or Olbinski were ineffective because of these problems.

Defendants say that Schmidt was not deliberately indifferent because he thought that treatment from female psychologists was appropriate. They characterize this issue as a mere disagreement between Schmidt's assessment of the efficacy of this treatment and Robbins's contrary opinion. It is not immediately clear from Williams's briefing that he disputes this—he continues to use "standard of care" language more relevant to a malpractice action. And Robbins's expert report does not provide much clarity. He states that treatment with male psychologists is "very appropriate and should be respected" and that Williams "should not be forced to work with a female psychologist." Dkt. 69-1, at 5. But in Robbins's deposition, he clarifies what he means by this. This testimony could lead a reasonable jury to conclude that this course of treatment was deliberately indifferent:

> Q Okay. And do you believe that it would never be appropriate—I'm sorry, strike that. Do you believe that any reasonable psychologist would decide that Williams could only be seen by male psychologists?
>
> A So I believe that when somebody has been sexually mistreated in a prison by a male or a female that for them to request to see the other gender would seem to me standard psychological practice and I would think anyone who has experience in working with patients who have been sexually mistreated would agree with that.

. . . .

Q So you don't view this as a difference of professional judgment, meaning you don't think it's appropriate under any circumstance that Mr. Williams would have to see a female psychologist?

. . . .

A Yes, that's fair.

. . . .

Q And so is it fair to say that you believe that Dr. Schmidt's opinion that it was not clinically necessary to have Williams see only male clinicians was an egregious departure from the applicable standard of care?

. . . .

A So I believe it's pretty outrageous that under the—he was a prisoner in the Department of Corrections, he was sexually mistreated by a psychologist and in order to deal with some of the symptoms, that led to he wanted to be seen by someone of the other gender. I guess it's hard for me to imagine how the Department of Corrections can argue that that's not an appropriate request. So, yes, I think it's egregious.[7]

Dkt. 69, at 59-60. In my order screening Williams's complaint, I stated that "it is extremely unlikely that defendant Schmidt's assignment of female psychologists to Williams could demonstrate deliberate indifference toward him even given his traumatic experience regarding Acor." Dkt. 13, at 7 n.1. But this expert testimony is sufficient to suggest that Schmidt's decision to assign Breen and Olbinski to Williams, given Williams's experience with Acor, was

---

[7] Counsel for Williams objected to various questions asked by the assistant attorney general aimed at understanding whether the decision to assign him female psychologists was merely a matter of medical negligence or if it went beyond that. Dkt. 69, at 57-60. Seeing as one purpose of obtaining an expert in deliberate indifference cases is to explain exactly how egregious a departure from accepted practice certain treatment decisions are, the state's questions were reasonable. Unfortunately for the state, Robbins's answers are enough to raise a genuine dispute of material fact over defendants' deliberate indifference.

so far outside the scope of accepted medical practice that Schmidt was not genuinely using medical judgment in doing so. Robbins also stated that Williams's condition has not improved through his treatment, which suggests that, despite Williams's unease with being treated with female psychologists, defendants Schmidt, Breen, and Olbinski persisted in providing treatment they knew was ineffective.

Williams points to related problems that add to this claim. He contends that Breen and Olbinski are "biased" against him because of the events involving Acor, and that Schmidt knew this. Schmidt wrote an email stating, "I have, in fact, heard clinicians here talk about Williams in quite negative terms and basically saying they don't think they can take him at face value. To me, that did reflect some lack of objectivity on their part. I think some of the female clinicians here did view him more negatively because of the events at WCI." Dkt. 67, at 24. Williams also says that this bias led them to misdiagnose his "hallucinations" or "flashbacks" of Acor as malingering, which I take him to be saying means that he did not receive proper treatment for these symptoms.

Defendants argue that the disputes over diagnoses are at most matters of professional judgment that do not indicate deliberate indifference. I also take them to be arguing that the "bias" alleged by Williams should more accurately be characterized as reasonable skepticism given their view of Williams's behavior regarding his interactions with Acor as manipulative, and his score in the high range of psychopathy. And even if it were true that Breen and Olbinski disliked Williams because of the events regarding Acor, the mere fact that a medical professional holds negative viewpoints of a patient does not necessarily mean that the professional's treatment decisions are deliberately indifferent or even incorrect. Defendants have certainly produced evidence that could lead a reasonable jury to conclude that they did

the best job they could dealing with a difficult patient. But a reasonable jury could alternatively conclude that Schmidt, Olbinski, and Breen persisted in treating Williams with talk therapy that they knew was not going to work given his past trauma regarding Acor. Accordingly, I will not grant defendants summary judgment on the substantive aspects of Williams's claims regarding his treatment by defendants Breen and Olbinski, and defendant Schmidt's assignment of these defendants. Defendants' qualified immunity argument regarding these claims will be discussed below.

But these are the only portions of the medical care claims that survive this opinion. Schmidt took over Williams's treatment in June 2012 and quickly thereafter removed the malingering diagnosis. Because I have rejected Williams's arguments about medical notes and Dialectical Behavior Therapy, there is no genuine issue of material fact that could lead a reasonable jury to conclude that the post-June-2012 treatment by Schmidt violated the Eighth Amendment. The same goes for any medical care claims Williams brings against defendant Hamilton. Therefore, I will grant defendants summary judgment on these claims.

### 4. Qualified immunity

Defendants contend that they should be granted summary judgment on Williams's medical care claims under the doctrine of qualified immunity. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In deciding whether a right is "clearly established," courts ask "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). A plaintiff bears the burden of establishing that the constitutional right was clearly established. *Volkman*

*v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013). Although the plaintiff need not point to a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "In other words, 'the plaintiff must demonstrate either that a court has upheld the purported right in a case factually similar to the one under review, or that the alleged misconduct constituted an obvious violation of a constitutional right.'" *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 915 (7th Cir. 2015) (quoting *Lunini v. Grayeb*, 395 F.3d 761, 769 (7th Cir. 2005)).

Inexplicably, Williams does not address defendants' qualified immunity argument in his opposition brief. Because I am already having the parties provide supplemental materials regarding Williams's conditions-of-confinement claims, I will also have them provide supplemental briefing on the qualified immunity issue. Because this supplemental briefing schedule will run into the early August trial date, I will strike the trial date and associated pretrial deadlines, and I will reset them if any of Williams's claims survives the supplemental briefing.

## ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 71, is GRANTED with respect to plaintiff Derek Williams's medical care claims against defendant Hamilton and medical care claims regarding post-June-2012 treatment by defendant Schmidt.

2. A summary judgment ruling on the remainder of defendants' claims is deferred pending the submission of supplemental materials. Plaintiff may have until July 10, 2017, to submit supplemental proposed findings of fact and briefing regarding his conditions-of-confinement claim and the qualified immunity issue regarding his medical care claims. Defendants may have until August 7, 2017, to file responsive materials.

3.  The August 7, 2017 trial date and associated pretrial deadlines are STRUCK.

Entered June 14, 2017.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge