IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DEREK M. WILLIAMS,

                Plaintiff,

   v.                                                            OPINION and ORDER

DR. SCHMIDT, DR. BREEN,                                  14-cv-487-jdp
DR. HAMILTON, and DR. OLBINSKI,

                Defendants.

---

      This case is before the court on the third round of summary judgment. The only claims remaining in the case are plaintiff Derek Williams's claims that (1) defendant Todd Hamilton, a psychologist, placed him in unconstitutionally harsh conditions of confinement while he was on "observation" status at Green Bay Correctional Institution (GBCI), and (2) defendants Steven Schmidt, Martha Breen, and Katie Olbinski, also psychologists, acted with deliberate indifference to Williams's mental health needs by refusing to assign him to a male psychologist and persisting with treatment that they knew was ineffective. In a June 14, 2017 decision, I directed the parties to supplement their briefing with facts and arguments addressing the conditions-of-confinement claim and defendants' entitlement to qualified immunity. Dkt. 89. Having now reviewed the parties' supplemental briefs, Williams's supplemental proposed findings of fact, and defendants' responses, I conclude that Williams has failed to show that Hamilton was deliberately indifferent to his conditions of confinement, but that there are disputed issues of material fact relating to Williams's mental health treatment claim. Therefore, I will grant defendants' motion as to the conditions-of-confinement claim but will deny the motion as to the mental health claim. This case will be set for a telephonic status conference so that a new trial schedule can be set.

ANALYSIS[1]

A. Conditions of confinement

Williams contends that Hamilton violated the Eighth Amendment by depriving him of "humane conditions of confinement." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). *See also Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006). An Eighth Amendment "conditions-of-confinement" claim has two parts. First, the inmate must show that the alleged deprivation was objectively, "sufficiently serious," such that an official's act or omission results in the "denial the minimal civilized measure of life's necessities." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (*citing Farmer*, 511 U.S. at 834). This means that to defeat summary judgment, Williams must show that a factfinder reasonably could conclude that the conditions of his confinement "exceeded mere discomfort and were constitutionally unacceptable." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (citations omitted). Second, the inmate must show that the prison official acted with a subjectively culpable state of mind, known as "deliberate indifference." Deliberate indifference means that the official knew about the risk of harm, had the ability to prevent the harm, and failed to do so. *Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009).

Williams's conditions-of-confinement claims concern two periods he spent in observation status at GBCI in 2011: January 31 to February 10, and March 21 to May 11 or

---

[1] The June 14, 2017 opinion and order, Dkt. 89, included an extensive discussion of the background facts relevant to Williams's claims. Rather than repeat those facts here, I will assume familiarity with the general facts regarding Williams's confinement at GBCI, his mental health treatment history, and his sexual relationship with a now-deceased prison psychologist. I have included supplemental facts within the analysis section as necessary to evaluate Williams's remaining claims.

16. In previous summary judgment filings, Hamilton had argued that he was entitled to summary judgment on Williams's conditions-of-confinement claim on preclusion grounds and on the merits. I concluded that preclusion principles did not bar Williams's claim. As for the merits, I ordered additional briefing because the parties had provided few findings about the actual conditions faced by Williams and Hamilton's knowledge of them.

In his supplemental proposed findings of fact, Williams provides significant detail regarding the conditions he endured in the observation cells. In particular, he alleges that for a total of 66 days, 56 of which were consecutive, his experienced the following conditions in his observation cells:

- Extreme isolation. Williams was confined to his small cell 24 hours a day and did not have access to recreation.

- Extremely cold temperatures. Williams estimates that the cell temperature was between 35 and 45 degrees because ice formed on the interior glass of his cell, he could see his own breath, and he would shake so violently from the cold temperatures that sometimes he had difficulty eating.

- Inadequate clothing. Williams's only item of clothing was a sleeveless smock made from quilted material about one-half inch thick that reached his knees. He also had one blanket and a rubber mat that was approximately two inches thick. (There is some dispute about whether Williams had two blankets and no smock during some of the time he was on observation, but the dispute is immaterial.)

- Constant noise and sleep interruption. Correctional officers performed checks on Williams every 15 minutes while he was on observation. If Williams was asleep, the officers would kick or knock on Williams's cell door until he woke up and moved. Additionally, other inmates in nearby cells would scream, yell, and kick the steel cell doors or the aluminum sinks in their cells, making nearly constant noise that prevented Williams from sleeping.

- Constant illumination. Williams's cell was illuminated 24 hours a day by a bright overhead florescent light. The brightness of the light was enhanced by a reflector on the light fixture and the eggshell white color of cell walls. The light could be dimmed to a "night light" setting by staff, but staff never dimmed Williams's light.

3

- A filthy cell. Williams's cell was not cleaned adequately before he was placed in it. The walls were smeared with feces and urine and he was not permitted to clean the cell during his confinement.

- Lack of eyeglasses. Williams was not allowed to wear his prescription eyeglasses while in observation, so he was forced to squint excessively. He developed headaches as a result.

- Inadequate toilet paper and soap. Williams was given only three or four squares of tissue to use after he used the toilet. This was an insufficient amount to properly clean himself and his hands would become dirty. He also received an inadequate amount of soap. As a result, he often could not eat because his hands were too dirty.

Williams has identified several deplorable conditions. But as defendants point out, Williams's conditions-of-confinement claim must be considered in the context of his status at the time. Harsh and isolating conditions may not violate the Eighth Amendment if there were no "feasible alternatives." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 666 (7th Cir. 2012). *See also Walker v. Shansky*, 28 F.3d 666, 673 (7th Cir. 1994) ("Whether [segregation] does in fact violate the Eighth Amendment depends on the duration and nature of the segregation and the existence of feasible alternatives."); *Meriwether v. Faulkner*, 821 F.2d 408, 416–17 (7th Cir. 1987) ("Obviously influencing whether prolonged segregation constitutes cruel and unusual punishment is the existence of feasible alternatives."). In this instance, Williams was placed in observation because he was suicidal and had engaged in numerous acts of self-harm. Some of the conditions identified by Williams are inherent in the observation placement for handling suicidal prisoners. Suicidal inmates are removed from regular cells, isolated, and placed in constantly-illuminated cells for their own protection, so that staff can monitor them more closely. Clothing, blankets, eyeglasses, hygiene items, and other property items are prohibited to reduce the inmate's ability to engage in self-harm. Likewise, inmates on observation are not permitted to leave their cells for recreation and are given bagged meals that must be eaten with

their hands to reduce the inmate's ability to obtain items that could be used for self-harm. *See Cavalieri v. Shepard*, 321 F.3d 616, 621 (7th Cir. 2003) ("[P]risons and jails have developed procedures for dealing with prisoners who display suicidal tendencies, such as removing items that could be used as a suicide weapon, like sheets or a study telephone cord, or not leaving those prisoners unattended.").

That being said, Williams's observation status does not justify all of the conditions Williams has challenged, including the extreme temperatures, filthy cell, lack of soap, constant bright lighting, and constant noise. Although Hamilton disputes whether the conditions were as bad as Williams alleges, I must accept Williams's description of his conditions as true at this stage. Assuming Williams's description of his conditions is accurate, Williams has described conditions that arguably denied him the minimal civilized measure of life's necessities.

Several courts have concluded that exposing prisoners to extreme temperatures without adequate protection from the cold could violate the Eighth Amendment. *See, e.g., Townsend*, 522 F.3d at 774 ("[C]onfinement in isolation without adequate clothing or bedding supports Eighth Amendment claim.") (citations omitted); *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997) (prison must provide adequate shelter and "protection from extreme cold"). Conditions that prevent sleep, such as excessive noise or constant illumination, may violate an inmate's Eighth Amendment rights. *See, e.g., Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013) ("[S]leep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment."). Placing an inmate in a filthy cell without means to clean it may also violate the Eighth Amendment. *See, e.g., Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013) ("[U]nhygienic conditions, when combined with the jail's failure to provide detainees with a way to clean for themselves with running water or other supplies, state a claim for relief.");

*Vinning-El v. Long*, 482 F.3d 923, 924 (7th Cir. 2007) (prisoner held in cell for three to six days with no working sink or toilet, floor covered with water, and walls smeared with blood and feces); *Isby v. Clark*, 100 F.3d 502, 505–06 (7th Cir. 1996) (prisoner held in segregation cell that allegedly was "filthy, with dried blood, feces, urine and food on the walls"). Therefore, I will assume that Williams's allegations are sufficient to satisfy the objective component of his conditions-of-confinement claim. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014) ("We must . . . construe the record in the light most favorable to the nonmovant and avoid the temptation to decide which party's version of the facts is more likely true.").

The critical issue is whether Williams's evidence would permit a jury reasonably to find that Hamilton was responsible for Williams's conditions of confinement. To be liable under § 1983, Hamilton must have been "personally responsible" for the constitutional deprivation, which means that he "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (citations and quotation marks omitted).

I can assume that Williams complained to Hamilton about the harsh conditions of his observation cells. According to Williams, he told Hamilton about the harsh conditions of his confinement on numerous occasions. Williams says that during Hamilton's rounds in the segregation unit, he complained to Hamilton repeatedly about the conditions of his confinement. He says he told Hamilton on numerous occasions that his cell was filthy and needed to be cleaned, that his cell was freezing and that he needed an extra blanket or socks, that he was not receiving enough toilet paper to properly clean himself, that his hands were dirty and he needed additional orders for soap, that he was not getting enough sleep, and that he was becoming more anxious and depressed because of the constant illumination in his cell,

6

the noise in the unit, and the manner in which correctional officers conducted their rounds. Hamilton denies that Williams complained to him about the various conditions discussed above, but again, I must accept as true Williams's version of events at this stage. *Miller*, 761 F.3d at 827.

The closer question is whether Hamilton, after hearing Williams's complaints, had the responsibility or ability to alter any of the conditions about which Williams complained. Hamilton argues that he did not have any personal involvement in creating, or have the responsibility to alleviate, most of the conditions about which Williams complained. Specifically, security staff, not Hamilton or the psychological services unit, was responsible for cleaning the observation cells, distributing toilet paper and soap, and controlling cell lighting, temperature, noise, and the manner of observation checks.

"A prison official's knowledge of prison conditions learned from an inmate's communications can, under some circumstances, constitute sufficient knowledge of the conditions to require the officer to exercise his or her authority and to take the needed action to investigate and, if necessary, to rectify the offending condition." *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996). This may be true even if the prison official is not generally responsible for addressing the particular condition at issue. For example, "[i]f a prisoner is writhing in agony, [a] guard cannot ignore him on the ground of not being a doctor." *Estate of Miller by Chassie v. Marberry*, 847 F.3d 425, 432 (7th Cir. 2017) (citations omitted). A prison warden who "knows that a prisoner's potentially very dangerous health condition is being ignored by the prison's guards and medical staff that she—the warden—supervises," must attempt to help the prisoner. *Id. See also Haywood v. Hathaway*, 842 F.3d 1026 (7th Cir. 2016) (finding warden had personal involvement where, in response to grievance, he gave written instructions to the prison's

7

engineering staff, received a report, and visited the scene, after which he explicitly found no further problems existed). On the other hand, prison officials can divide and delegate tasks, and "no prisoner is entitled to insist that one employee do another's job." *Burks v. Raemisch*, 555 F .3d 592, 595 (7th Cir. 2009). Additionally, prison officials "cannot be thought to be reckless if the remedial step was not within their power." *Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012).

In this instance, even if I assume that Williams was housed in harsh conditions and that he complained repeatedly to Hamilton about them, Williams has not submitted sufficient evidence to show that Hamilton acted with deliberate indifference to Williams's complaints. Although Hamilton says that he does not recall Williams complaining about any condition in particular, he says that if Williams had complained about cell conditions that were controlled by security staff, he would have told Williams to raise the complaints with security staff directly. *See, e.g.*, Hamilton Decl., Dkt. 102, ¶ 24 ("If Williams talked to me about how many squares of toilet paper he needed, I would have told him to speak with security staff.").

Hamilton's suggestion that Williams should have directed his complaints to security staff makes sense. It is undisputed that the psychological services unit, and Hamilton specifically, did not control the conditions of Williams's cell. Although a psychologist (not Hamilton) decided that Williams should be placed in observation for his own protection, psychologists have no say as to which observation cell an inmate is assigned. Security staff picked Williams's cell and was responsible for ensuring that it was cleaned before he was transferred to it. Once he was in the observation cell, security staff was responsible for Williams's cell conditions and his day-to-day care. Hamilton saw Williams once a day, at most, during the brief time period during which Hamilton conducted rounds in the segregation unit,

and only on the days that Hamilton was assigned to the unit. Thus, Hamilton knew about Williams's cell conditions based solely on his brief interactions with Williams. Hamilton may have been able to observe some of the conditions, such as cold temperatures, during his brief visits, but Hamilton was not in a position to observe how security staff conducted observation checks throughout the day or whether and how often they dimmed the lights in Williams's cell. In contrast, security staff checked on Williams every 15 minutes, all day long, every day. Security staff was in a far better position to observe and respond to the cell conditions about which Williams complains. In fact, security staff appears to have been either responsible for causing the harsh conditions or, at least, permitting them to go uncorrected.

The record shows that Williams did complain to security staff about his cell conditions. At his deposition, he says he complained to "various" correctional officers about his cell temperature. Williams's Dep., Dkt. 66, at 30. Williams submitted declarations from two inmate witnesses who say that they heard Williams complaint "constantly" to Captain Schultz in the segregation unit about his cell conditions, including the cold temperatures, loud noises and insufficient toilet paper. Dkt. 92 and Dkt. 93. Williams does not say whether he told Hamilton that he had tried to address his cell conditions with security staff.

On this factual record, I am not persuaded that Hamilton should be liable for security staff's failure to address Williams's harsh cell conditions. Hamilton did not supervise security staff and Williams has submitted no evidence suggesting that Hamilton had any ability or authority to change Williams's cell conditions. This is not a situation in which a prison official was aware of a substantial risk of harm but "refus[ed] or declin[ed] to exercise the authority of his or her office." *Arnett v. Webster*, 658 F.3d 742, 755–56 (7th Cir. 2011). *See also Haywood*, 842 F.3d at 1033 (warden could be liable for conditions-of-confinement claim because he was

"individual in the position to remedy [the conditions]"). Hamilton could have passed on Williams's complaints about his cell conditions to security staff. But Williams has submitted no evidence suggesting that Hamilton's passing on complaints from Williams would have had any influence on security staff, particularly where security staff was necessarily aware of Williams's cell conditions already. *See Daugherty v. Page*, 906 F.3d 606, 611–12 (7th Cir. 2018) (plaintiff cannot succeed on a conditions-of-confinement claim without submitting "any evidence about what either defendant may have done or not done" to change the conditions). Nor has Williams cited any legal authority suggesting that someone in Hamilton's position could be liable under the Eighth Amendment for failing to tell other prison officials, over whom he has no supervisory authority and who were aware of the conditions already, that the conditions should be changed.

In sum, although I am sympathetic to Williams's complaints about the conditions in which he was held, I am not persuaded that Hamilton could be liable for those conditions. Accordingly, I will grant summary judgment to Hamilton on Williams's conditions-of-confinement claim.

**B. Mental health treatment**

In the June 14, 2017 opinion and order, I concluded that Williams had raised a genuine dispute of material fact regarding whether defendant psychologists Steven Schmidt, Martha Breen, and Katie Olbinski violated his Eighth Amendment rights by failing to provide him with adequate mental health treatment. Dkt. 89 at 23. Specifically, the testimony of Williams's expert, Dr. Kenneth Robbins, raised a genuine factual dispute about whether defendants Schmidt, Breen, and Olbinski acted so far outside the scope of accepted medical practice that they were not using medical judgment when they assigned Williams a female psychologist and

10

persisted in ineffective talk therapy despite knowing about his past trauma with a female prison psychologist. *Id.* at 22. However, I gave the parties the opportunity to file additional arguments regarding defendants' entitlement to qualified immunity on this claim. After considering the parties' arguments, I conclude that defendants are not entitled to qualified immunity.

A prison official is immune from suit if the constitutional right at issue was not clearly established at the time of the violation, and thus a reasonable officer would not have known that his conduct was unlawful. *Mitchell v. Kallas*, 895 F.3d 492, 499–500 (7th Cir. 2018). In deciding whether a right was clearly established, it is essential to assess the case at the right level of specificity. *White v. Pauly*, 137 S. Ct. 548, 551–52 (2017). This means that the "clearly established law must be 'particularized' to the facts of the case." *Id.* at 552. But the particularity requirement "does not go so far as to mandate a mirror-image precedent from the Supreme Court or [court of appeals]." *Mitchell*, 895 F.3d at 500.

Defendants argue that they are entitled to qualified immunity because Williams cannot point to clearly established law stating that "an inmate is constitutionally entitled to choose the gender of his mental health practitioner." Dft.'s Br., Dkt. 100, at 5. But defendants have defined the right at issue too narrowly.

The "right to be free from deliberate indifference" to serious medical and mental health needs under the Eighth Amendment is well established. *Estate of Clark v. Walker*, 865 F.3d 544, 551–52 (7th Cir. 2017) (citing *Hall v. Ryan*, 957 F.2d 402, 404–05 (7th Cir. 1992) ("It was clearly established in 1986 that police officers could not be deliberately indifferent to a detainee who is in need of medical attention because of a mental illness or who is a substantial suicide risk."); *Hayes v. Snyder*, 546 F.3d 516, 528 (7th Cir. 2008) ("It has been established for decades that prison physicians violate inmates' constitutional rights when they deliberately disregard

11

an inmate's serious medical condition."); *Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001) ("The need for a mental illness to be treated could certainly be considered a serious medical need."). As the Court of Appeals for the Seventh Circuit stated recently, the Eighth Amendment duty "need not be litigated and then established disease by disease or injury by injury." *Id.* at 553 (rejecting a highly specific framing of the right at stake). *See also Estate of Perry v. Wenzel*, 872 F.3d 439, 460 (7th Cir. 2017) (same).

For example, in *Mitchell*, 895 F.3d at 499–500, a prisoner brought an Eighth Amendment claim based on being denied hormone treatment for her gender dysphoria. The defendant doctor argued that he was entitled to qualified immunity because "no binding decision guarantees inmates the right to a speedier gender dysphoria evaluation or short-term hormone therapy prior to release." *Id.* at 499. The court of appeals rejected the state's framing of the right at issue as too narrow, and concluded that the right at issue was "whether a prison doctor would have known that it was unconstitutional *never* to provide a person with the appropriate treatment for her particular case." *Id.* (emphasis in original). The court of appeals concluded that it had been clearly established for years that "leaving serious medical conditions . . . untreated can amount to unconstitutional deliberate indifference." *Id.* It was also clearly established that providing treatment that does "nothing" to treat the serious medical condition can be deliberate indifference. *Id.* ("And even if the therapy sessions addressed [plaintiff's] gender dysphoria to a degree, she may still recover if they did nothing actually to treat her condition.").

In this instance, the legal standard for Eighth Amendment medical and mental health care claims was clearly established by 2011 and 2012, and the disputes raised by the parties are largely factual, rather than legal. Defendants concede, at least for purposes of summary

12

judgment, that Williams had serious mental health needs that required treatment. By 2011, a prison psychologist would have known that it was unconstitutional to provide treatment for Williams's serious mental health needs that was totally ineffective or actually harmful. *See id.* at 499–500 (explaining that plaintiff could succeed on claim regarding denial of hormone therapy because "[p]rison officials have been on notice for years that leaving serious medical conditions . . . untreated can amount to unconstitutional deliberate indifference."). According to Dr. Robbins's opinion, assigning Williams to female psychologists for talk therapy was ineffective and did nothing to address Williams's mental health needs.

On the other hand, the facts of this case may be distinguishable from those in *Mitchell*, because Williams' mental health needs were not necessarily "untreated." Here, the evidence shows that Williams received treatment in addition to talk therapy with female psychologists to address his mental health needs, including monthly psychiatric appointments and medication. But the facts regarding the effectiveness of this treatment are disputed. Dr. Robbins gave the opinion that Williams would be functioning well in prison if he were receiving appropriate treatment but, because he was not, Williams's "condition has not improved." Robbins' Dep., Dkt. 69, at 18. Thus, as in *Mitchell,* if the treatment Williams received did "nothing actually to treat h[is] condition," or actually made his condition worse, Williams may still succeed on his Eighth Amendment claim despite receiving some treatment. In light of Dr. Robbins's opinions, defendants are not entitled to summary judgment on the ground of qualified immunity. Williams's claim that he was denied adequate mental health treatment must proceed to trial.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 71, is GRANTED with respect to plaintiff Derek Williams's conditions-of-confinement claim against defendant Todd Hamilton, and DENIED with respect to plaintiff's claim that defendants Steven Schmidt, Martha Breen, and Katie Olbinski acted with deliberate indifference to plaintiff's mental health needs by refusing to assign him to a male psychologist and persisting with treatment that they knew was ineffective.

2. The clerk of court is directed to set this case for a telephonic scheduling conference before the magistrate judge for the purposes of setting a new trial schedule.

Entered March 5, 2019.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge